1             IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3  UNITED STATES OF AMERICA,   )  **Case No. 3:12-MJ-037-BK-1**
                        )
4        Plaintiff,      )  **Eastern District of Virginia**
                        )  **Case No. 4:12-MJ-11**
5  v.                   )
                        )  Dallas, Texas
6  OSCAR GONZALEZ,          )  January 26, 2012
                        )  2:00 p.m. Docket
7        Defendant.      )
                        )  DETENTION HEARING
8                        )  PRELIMINARY HEARING
  _____)

9              TRANSCRIPT OF PROCEEDINGS
10     BEFORE THE HONORABLE RENEE HARRIS TOLIVER,
           UNITED STATES MAGISTRATE JUDGE.

11  APPEARANCES:

12
  For the Government:       Rick Calvert
13                    ASSISTANT UNITED STATES ATTORNEY
                    U.S. DEPARTMENT OF JUSTICE
14                    1100 Commerce Street, 3rd Floor
                    Dallas, TX  75242-1699
15                    (214) 659-8600

16  For the Defendant:       Kirk F. Lechtenberger
                    KIRK F. LECHTENBERGER, P.C.
17                    2525 McKinnon, Suite 420
                    Dallas, TX  75201
18                    (214) 871-1804

19  Court Recorder:          Angela French
                    UNITED STATES DISTRICT COURT
20                    1100 Commerce Street, Room 1611
                    Dallas, TX  75242-1003
21                    (214)_753-2169

22  Transcription Service:    Kathy Rehling
                    209 Bay Circle
23                    Coppell, TX  75019
                    (972) 304-1998
24
25      Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

1                 DALLAS, TEXAS - JANUARY 26, 2012 - 2:12 P.M.

2           THE COURT:  The Court next calls Cause No. 3:12-MJ-11

3  [sic] [3:12-MJ-37], United States of America versus Oscar

4  Gonzalez.

5           MR. CALVERT:  Rick Calvert for the Government.

6           THE COURT:  Thank you, Mr. Calvert.

7           THE COURT:  Mr. Gonzalez, you're appearing here today

8  for your detention and preliminary and identification hearings.

9  You may join your counsel at counsel table.

10     Mr. Calvert, are you ready to proceed?

11          MR. CALVERT:  We are, Your Honor.

12          THE COURT:  Mr. Lechtenberger?

13          MR. LECHTENBERGER:  Yes, Your Honor, with one *caveat*.

14 Your Honor, I'm going to fall on the sword a little bit with

15 the Court.  I had told my client not to talk to anybody, and I

16 failed to tell him that it was okay to talk to Pretrial

17 Services.  Thus, you will see your blue copy, Your Honor, where

18 my client invokes his Fifth Amendment privilege.

19          THE COURT:  Right.

20          MR. LECHTENBERGER:  That was my mistake.  He certainly

21 didn't mean to be disrespectful to the Court or to try to play

22 games, or, worse, what some people would term to be lawyering

23 up.  That was my fault when I went to go see him.  So, we can

24 certainly clarify that if the Court does desire, if you find

25 merit with my argument.  I'd like to have the opportunity for

 1  him to cooperate with Pretrial, make sure this is all verified,

 2  confirmed and substantiated.  Because I have seen you from time

 3  to time, Your Honor, say it's not sufficient in here and with

 4  other lawyers, and I just don't want to make that mistake.  So,

 5  I thought you'd appreciate my brevity and directness.

 6          THE COURT:  I do.  And I agree with you that that

 7  would probably be a good idea, in light of the detention issue,

 8  if --

 9          MR. LECHTENBERGER:  Fair enough, Your Honor.

10          THE COURT:  -- for no other reason.  How long do you

11  think you'll need?

12          MR. LECHTENBERGER:  Well, would it be okay if we

13  proceeded further, and if you find merit with my argument,

14  which I hope you will, that I can dovetail that back in right

15  afterwards with Pretrial Services?  And I certainly don't want

16  to inconvenience them and probably over under ten minutes.

17          THE COURT:  Okay.  They're not going to be able to do

18  a report or interview him probably today.  So, are you saying

19  get to the point that we've heard all the evidence and then

20  continue the hearing?

21          MR. LECHTENBERGER:  Well, I guess with Mr. Calvert's,

22  probably, input, what I would propose is just to go ahead and

23  do everything right now.  And I think I will have a persuasive

24  argument to the Court, and hopefully you'll say, Mr.

25  Lechtenberger, I'm going to go ahead and delay this for a few

1   days, let Mr. Gonzalez firm this up with Pretrial Services,

2   have the Pretrial Services call -- I have all my relatives and

3   family members here for support.  And then if we can reconvene

4   at a later point that's convenient for Mr. Calvert, you, as

5   well as Pretrial.

6           THE COURT:  And the only problem is, if we are

7   required to convene after --

8           MR. LECHTENBERGER:  I'll waive it.

9           THE COURT:  No, no, no.

10          MR. LECHTENBERGER:  Mr. Gonzalez will waive it.

11          THE COURT:  After Friday, then it would technically go

12  to the next magistrate judge.  I could keep it, but that's

13  technically what happens.

14      But we can proceed now.  Call your first witness, Mr.

15  Calvert.

16          MR. CALVERT:  Your Honor, at this time the Government

17  would call DEA Task Force Officer Tommy Hale.

18              TOMMY HALE, GOVERNMENT'S WITNESS, SWORN

19                       DIRECT EXAMINATION

20  BY MR. CALVERT:

21  Q    Sir, please state your name for the Court.

22  A    Tommy Hale, H-A-L-E.

23  Q    How are you employed, sir?

24  A    I am an investigator with the Dallas District Attorney's

25  Office and assigned to the Drug Enforcement Administration.

1  Q    As an assignee of the Drug Enforcement Administration, what

2  are your duties and responsibilities?

3  A    Investigate the drug laws and violation in the United

4  States.

5  Q    How long have you held that position?

6  A    I've been there approximately 20 years.

7  Q    I'm going to ask you if you become aware earlier, or I

8  guess midway through 2011, of a criminal investigation that was

9  taking part in the Eastern District of Virginia which touched

10 upon individuals that you were able to identify here in the

11 Northern District of Texas?

12 A    Yes, I did.

13 Q    Please tell the Court a little bit about that investigation

14 and what you learned in regard to a specific individual here in

15 Dallas as it related to that investigation?

16 A    We had received information in 2011 regarding a drug

17 organization that was operating in Dallas, Texas that was

18 transporting large sums of cocaine into Norfolk, Virginia.

19 Q    Was Virginia able to put a quantity on the amount of

20 cocaine that was coming from the Northern District of Texas to

21 their district?

22 A    They said that they believed it was in excess of 100 kilos

23 over a two-year period of time that they -- at that point that

24 they had record of.

25 Q    After the cocaine, the powdered cocaine got to the Eastern

1   District of Virginia, what was happening to it there?

2   A   At that point it was given a group of individuals --

3       (Microphone noise.)

4   Q   Is that better?

5   A   It was given to group of individuals in Virginia.  It was

6   then distributed onto the streets of Virginia, both in powder

7   form and as crack cocaine.

8   Q   Was the investigation through the Eastern District of

9   Virginia also headed up by DEA?

10  A   It was headed up -- there was two agencies actually

11  investigating that side of it.  DEA was one and Immigration &

12  Customs Enforcement was the other agency.

13  Q   Through the investigation in the Eastern District of

14  Virginia, were law enforcement agents able to identify the

15  source of supply of the powdered cocaine that was being brought

16  to the Eastern District of Virginia?

17  A   Yes, they were.

18  Q   Who did they identify?

19  A   Demontre Morgan.

20  Q   What, if anything, do you know of Demontre Morgan?  And

21  what did you know of him at the time this investigation was

22  ongoing?

23  A   We knew that Demontre Morgan was living here in the Dallas,

24  Texas area and was operating a record label at that time.  We

25  knew that he was associating with several people here that had

1   moved here actually from Virginia that was assisting him in his

2   drug trafficking operation that was coming from Dallas into

3   Virginia.

4   Q   All right.  And prior to -- and ultimately Mr. Morgan was

5   named in an indictment that was returned in the Eastern

6   District of Virginia -- specifically, on December 13, 2011.  Is

7   that correct?

8   A   That is correct.

9   Q   Prior to that indictment being returned, had law

10  enforcement agents ever sat down and talked to anyone who

11  identified an individual who Demontre Morgan was getting his

12  powdered cocaine source -- or, his powdered cocaine from?

13  A   According to the agents in Virginia I spoke to, they had

14  interviewed an individual in Virginia that had identified a

15  young Hispanic male that had a gold grill that lived in Dallas,

16  Texas that was providing cocaine to Demontre that was

17  eventually ending up in Virginia.

18  Q   All right.  Did there come a point in time -- and let me

19  back up.  That individual, had he seen Demontre Morgan's source

20  of supply before?  Is that how he was able to identify him?

21  A   From my understanding, that's correct.

22  Q   He just didn't know what his name was?

23  A   He did not know his name.

24  Q   All right.  And at some point in time, did law enforcement

25  agents conduct a takedown of the Eastern District of Virginia

1  indictment?

2  A    Yes, we did.

3  Q    When did that take place?

4  A    That occurred on January the 17th.

5  Q    All right.  And as a result of that takedown, was Demontre

6  Morgan arrested here in the Northern District of Texas?

7  A    Demontre Morgan was arrested, as well as another one of his

8  associates.

9  Q    Immediately upon Mr. Morgan's arrest, was he given an

10  opportunity to speak to investigators?

11  A    He was.

12  Q    Did he voluntarily waive his right to remain silent and did

13  he fully and completely cooperate?

14  A    He did immediately.

15  Q    What did Mr. Morgan tell you as far as his role was in

16  getting the powdered cocaine up to the individuals in Virginia?

17  A    He told us that he was working with a Hispanic young male

18  here by the name of Oscar and that he would come to a location

19  in Dallas, Texas off of Weather Vane and that he had already

20  previously set up prior to the day of the arrest for 20 kilos

21  to be delivered to him on that Thursday.

22  Q    Did Mr. Morgan indicate how long he had been associated

23  with his cocaine source of supply he identified as Oscar?

24  A    For approximately two years.

25  Q    Did Mr. Morgan indicate how many kilograms of cocaine he

1  had previously been provided by his source of supply named

2  Oscar?

3  A   He could not give us an exact number, but he did state that

4  it was over 150 kilos.

5  Q   And you also indicated that prior to his knowledge of being

6  arrested in January of this year, he had previously arranged to

7  purchase 20 kilograms of cocaine from his source of supply.  Is

8  that correct?

9  A   That is correct.

10 Q   What did you and other law enforcement agents do with that

11 information?

12 A   At that time I asked him for the phone number of this

13 individual named Oscar, which he provided.  I also -- he

14 conducted telephone -- immediately that evening started making

15 telephone calls to Oscar -- it was consensually recorded -- and

16 asking Oscar if everything was good, and basically Oscar agreed

17 everything was good, that it would be delivered on Thursday,

18 and that they were supposed to contact each other on Thursday

19 morning to arrange for a time period for them to meet.

20     And where that comes into play is Demontre told us that

21 they were very time-sensitive, that normally when they did it

22 they tried to arrange that both individuals would show up at a

23 house on Weather Vane.  He actually took us to that house on

24 Weather Vane and pointed it out.  And he said that they would

25 -- the morning that they would make the delivery or the evening

1   they would make the delivery that they would coordinate with

2   each other and time it to where they both arrived at the

3   residence close to each other.

4   Q   In your discussions with Mr. Morgan, did he indicate

5   whether or not his source of supply actually lived at the

6   Weather Vane residence?

7   A   He told us that he didn't believe the individual known as

8   Oscar did live at the Weather Vane residence, that that house

9   was used primarily for the storage of cocaine and that once --

10  and for the delivery of cocaine.

11  Q   All right.  And did he indicate to you how the process

12  worked as far as when he called and said he had the money and

13  was ready to pick up cocaine, what happened next?

14  A   He did.  He said, once he made a phone call, that he would

15  chirp him.  And what he's talking about chirp him, they had a

16  radio phone or a push-to-talk phone that they used.  And that

17  he would place a phone call to him, tell him he was almost

18  there.  He said about -- they would open the garage, that he

19  would pull up into the garage of that residence, that Oscar

20  would come out into the garage area and look in the trunk to

21  see if the money was there.  Once he saw that the money was

22  there, then he would go back inside the residence, obtain the

23  cocaine, and he would come out, and they would make the

24  exchange in the garage.

25  Q   You indicated that law enforcement agents actually went to

1   that Weather Vane stash location.  Is that correct?

2   A   That is correct.  On the 17th is when Demontre took us and

3   pointed out the location.  We immediately then put out a -- or

4   my boss did, put out a broadcast out to everybody to go by that

5   residence, start doing drive-bys and surveillance on it.  On

6   Wednesday, Task Force Officer Jason Ford (phonetic) observed

7   Oscar at that location driving a maroon-colored Toyota Tacoma,

8   I believe it was.  The registration actually came back to Oscar

9   Gonzalez.  At that point we were able to identify and get a

10  picture of Oscar Gonzalez based off the surveillance.

11  Q   All right.  The individual -- and was Demontre Morgan able

12  to positively identify that Oscar Gonzalez as his cocaine

13  source of supply?

14  A   He was.  We obtained a picture of Oscar Gonzalez and showed

15  that photo to Demontre and he identified that Oscar Gonzalez

16  was in fact the Oscar that he knew that had been delivering the

17  cocaine.

18  Q   The individual that Demontre Morgan identified as his

19  source of supply that he knew as Oscar, is he the same

20  individual that law enforcement agents saw at the Weather Vane

21  residence at the time that surveillance was being conducted?

22  A   It is.  We also showed the picture to Task Force -- Jason

23  Ford, and he identified that it was the same individual that he

24  had seen in the truck.

25  Q   The individual that Demontre Morgan identified as his

1   cocaine source of supply and the individual that law

2   enforcement agents identified at the Weather Vane stash house,

3   do you see him in this courtroom today?

4   A   I do.

5   Q   Would you point him out and describe an article of clothing

6   he's wearing?

7   A   He's wearing orange and he's sitting to -- at the table

8   with Mr. Lechtenberger.

9           MR. CALVERT:  Your Honor, we'd ask the record reflect

10  that the witness has identified the Defendant, Oscar Gonzalez.

11          THE COURT:  The record will so reflect.

12  BY MR. CALVERT:

13  Q   And I don't want to jump too far ahead, but have you had an

14  occasion to speak with Mr. Gonzalez since he was placed in

15  custody?

16  A   Once he was arrested that night and brought -- I met them

17  at the Drug Enforcement Administration and I was able to talk

18  to him there.

19  Q   Do you know whether or not Mr. Gonzalez has gold teeth?

20  A   He does have.

21  Q   All right.  And is that consistent with the information

22  that was provided to law enforcement from the individual

23  involved in this investigation up in the Eastern District of

24  Virginia as being the individual that was providing all of the

25  cocaine?

1    A    It is.

2    Q    In regard to the consensually-monitored phone calls,

3    approximately how many phone calls were made between Demontre

4    Morgan and the Defendant?

5    A    There was approximately eight to ten phone calls made over

6    a period of time.

7    Q    And I know you touched on it, but can you specifically tell

8    the Court what was the nature of those phone calls, what were

9    they talking about?

10   A    When the initial phone calls started on the night of the

11   arrest, the first phone call was basically, was everything

12   good?  Did they have the stuff?  He said it would be there on

13   Thursday.  On Thursday morning, we got Demontre out, brought

14   him to the United States Attorney's Office.  He made additional

15   recorded calls, and it's where Oscar told him that the package

16   had not been dropped yet, that it would be on Saturday before

17   they would be able to take possession of it.

18        During the phone call as well, Demontre asked him, he said,

19   hey, since it's going to be Saturday, I'm having to turn the

20   guys around.  He was under the impression that people were

21   coming to pick it up, as they had always done, from Virginia.

22   He said, my guys are almost here.  I'm going to have them go

23   back.  He said, can you throw another one on the top for a

24   total of 21?  And Oscar at that point agreed to do so.

25        There was other phone calls subsequently after that where

1    they talked about the meeting place.  I actually had Demontre

2    record a call with him stating that he would not be able to

3    pick up the cocaine on Saturday -- and that was because the

4    U.S. Marshal's Office wouldn't allow us to get him out of

5    Seagoville -- and that it would be Monday morning, and Oscar

6    agreed to that.

7        We brought him back to the U.S. Attorney's Office on Monday

8    morning, and -- where we started making or attempting to make

9    other recorded phone calls, and at that point Oscar's phone

10   shut down.

11   Q   All right.  And did you have reason to believe at that

12   point in time that Mr. Gonzalez, the Defendant, had somehow

13   found out that Demontre Morgan was in custody?

14   A   Yes.

15   Q   And did you have reason to believe that he had thrown his

16   phone away?

17   A   Yes, we did.

18   Q   All right.  And is that a common practice, in your 20 years

19   of experience in investigating drug trafficking organizations,

20   that they do that?

21   A   It is very common.

22   Q   And you touched on it:  Did it also complicate matters, as

23   far as utilizing Mr. Morgan, in that at the time that he was

24   communicating with the Defendant, Mr. Morgan was in custody

25   with the United States Marshal's Service?

1   A    It did.

2   Q    At the time that the phone calls were being made between

3   Mr. Morgan and Oscar, did you or any other law enforcement

4   agent seek out any type of court order authorizing the tracking

5   of a cell phone ping?

6   A    We did.

7   Q    And just briefly tell the Court how that works.

8   A    We wrote an affidavit and took it to a state district judge

9   who authorized the tracking of the GPS of a Sprint cell phone,

10  which was the same phone that we were making recorded calls

11  with, and we were able to activate that phone and was able to

12  follow the whereabouts of Oscar Gonzalez.

13  Q    All right.  And did the data that you obtained as a result

14  of that cell phone track show that that phone was being

15  utilized in or around the Weather Vane stash house?

16  A    It did.

17  Q    Did it also show that that phone was being utilized at or

18  around the actual residence where Oscar Gonzalez actually

19  lives?

20  A    It did, which was an apartment complex off Garland Road and

21  Magellan area in Dallas, Texas.

22  Q    At some point in time, did law enforcement agents seek and

23  were granted a search warrant for the Weather Vane address?

24  A    Yes, we did.

25  Q    When did that take place?

1    A    That would have occurred on Monday.

2    Q    All right.  And in conjunction with that search warrant,

3    did law enforcement officials in the Eastern District of

4    Virginia swear out a criminal complaint in that district in

5    regard to naming this defendant, Oscar Gonzalez, as a defendant

6    in a one-count information, criminal information?  Or excuse

7    me, a complaint?

8    A    They did.

9    Q    Do you know when that warrant became active?

10   A    I believe that warrant was active on that Friday.  And I'm

11   losing track of my dates, but it would have been that Friday

12   after Demontre's arrest.

13   Q    All right.  And it was before the search warrant was

14   executed.  Is that correct?

15   A    That is correct.

16   Q    When was the search warrant executed?

17   A    It was executed Monday at approximately 10:45 a.m.

18   Q    Please tell the Court about the execution of that search

19   warrant.

20   A    At the search warrant location, we went in and conducted an

21   ion scan, which is a scientific instrument that's used by the

22   Drug Enforcement Administration and it collects particles in

23   different areas of the house off of cardboard boxes, out of

24   plastic containers that are commonly used to store narcotics.

25   And the results of that ion scan by the DEA laboratory showed

1  that there was high concentration of cocaine in two of the

2  rooms of the location, as well as, the garage, there was a high

3  concentration of methamphetamine that was located in containers

4  that was located in the trash in the garage area.

5  Q   Who was present at the time that the search warrant was

6  conducted at the Weather Vane address?

7  A   There was no one there.

8  Q   All right.  How many vehicles were located at that

9  location?

10 A   There was no vehicles located.

11 Q   All right.  Did you ultimately locate the Defendant, Oscar

12 Gonzalez?

13 A   We did.

14 Q   Please tell me where he was located.

15 A   He was located in an apartment complex there off of

16 Magellan and Garland Road.

17         MR. CALVERT:  Your Honor, may I approach the witness?

18         THE COURT:  Yes.

19 BY MR. CALVERT:

20 Q   Sir, I'm going to show you a series of photographs I've

21 marked as Government's Exhibit 1, 2, 3, 4, 5, 6, 7 and 8.  Do

22 you recognize those photographs?

23 A   I do.

24 Q   Please tell the Court what those photographs are.

25 A   These are photos that were provided to me from the agents

1  that were at that apartment during the arrest, and there are

2  several weapons that were located at the residence or in a

3  vehicle that was in the garage of that apartment complex.

4  Q   Do these photographs fairly and accurately depict what

5  they're intended to depict?

6  A   Yes, they do.

7        MR. CALVERT:  Your Honor, at this time the Government

8  would offer Government's Exhibits 1 through 8, please.

9        MR. LECHTENBERGER:  May I, Judge?

10       THE COURT:  Yes.

11     (Pause.)

12       MR. LECHTENBERGER:  Mr. Calvert showed these to me

13  before you hit the bench, Your Honor.  No objections.

14       MR. CALVERT:  May I publish --

15       THE COURT:  They're admitted.

16     (Government's Exhibits 1 through 8 are received into

17  evidence.)

18       MR. CALVERT:  May I publish to the Court, Your Honor?

19       THE COURT:  Yes.

20  BY MR. CALVERT:

21  Q   Agent, if you'll look with me at Government's Exhibit #1

22  and please tell me what Government's Exhibit #1 is a photograph

23  of.

24  A   There is two different weapons that are located on here.

25  One is a snub-nosed revolver and the other one is a Kel-Tec

1   assault rifle.  And the bottom picture is the Kel-Tec assault

2   rifle that is inside a bag.

3   Q   All right.  And all of these -- is this a photograph of

4   three separate weapons or two separate weapons?

5   A   It's actually two separate weapons.

6   Q   All right.  And were both of these weapons found in the

7   apartment of the Defendant, Oscar Gonzalez?

8   A   They were either found in the apartment of the -- I believe

9   the revolver was found in the apartment, and either the Kel-Tec

10  was found in the back of the vehicle that was located in the

11  garage, or inside the apartment.

12  Q   Please take a look at Government's Exhibit #2.  What is

13  depicted in Government's Exhibit #2?

14  A   The pictures on the top left is a tactical flashlight and

15  it appears that it has a laser mounted to that light, which is

16  commonly used in combat situations or in tactical situations by

17  law enforcement, and we are starting to see some of these

18  lights that are being found among drug traffickers.

19          MR. LECHTENBERGER:  That would be nonresponsive and I

20  would object to that last comment by the witness, Your Honor.

21          THE COURT:  Okay.  That objection is sustained.  And

22  if you want to ask him separately about it, go right ahead.

23  MR. CALVERT:

24  Q   Where was this weapon located, if you know?

25  A   This weapon here was located in a Escalade that was parked

1    inside the garage of the apartment.  The weapon is an assault

2    rifle, .223 caliber, that has a forearm grip on it and also a

3    collapsible stock.  This type of weapon is also either used in

4    combat, by police officers, or military.

5    Q    Based on your prior training and experience and

6    investigations of drug trafficking organizations, is this

7    commonly a weapon of choice by drug traffickers?

8    A    It is.

9    Q    Would you take a look at Government's Exhibit #3 and tell

10   the Court what that depicts?

11   A    In the top left it appears to be a bag.  There is two what

12   appears to be possibly 120- and 130-round magazine there laying

13   on the ground.  Inside the bag you will see another magazine

14   that is a drum-style magazine.  I believe that's probably a

15   total of 50 rounds in each side of that, which would be a total

16   of 100-round magazine that's shown there.

17   Q    That 100-round magazine that was located in that bag, first

18   of all, where was it -- where were these exhibits located, if

19   you know?

20   A    I believe these was also in the Escalade truck.

21   Q    Is that magazine sometimes referred to as a street sweeper?

22   A    It is.

23   Q    Please tell the Court why it's referred to as a street

24   sweeper.

25   A    Large-capacity magazine, multiple rounds, to where they do

1   not have to reload and they have several rounds that they can

2   spray out over a large area.

3   Q    In your prior training and experience in investigating drug

4   trafficking organizations, is it common for drug trafficking

5   organizations to utilize these types of magazines?

6   A    It is.

7   Q    Government's Exhibit #4, what does that depict?

8   A    This is also the bag.  The top right-hand corner, if you'll

9   see the bag, is where there was at least four 30-round

10  magazines that were inside that bag.  On the bottom part of it,

11  you will see where they have got the -- says M-16 magazine

12  there, displaying what type of magazine that is.

13  Q    Government's Exhibit #5?

14  A    Is more pictures of the .223 caliber assault rifle in the

15  case, and then it's just a closer shot where it's an Inter Arms

16  (phonetic) made out of Houston, and the caliber that it is as

17  well.

18  Q    Government's Exhibit #6?

19  A    Is a Glock box.  I believe there was a Glock 9 millimeter

20  pistol also found there in the house.  There is, to the right

21  of that, is three large-capacity magazines for that Glock.  The

22  bottom is another picture of the assault rifle.  And then over

23  to the right is a picture of that box with a revolver in it.

24  To the right of that revolver is Glock magazines for a semi-

25  automatic pistol.

1  Q    And Government's Exhibit 7 and 8?

2  A    7 is the revolver again pictured.  It was located.  And

3  then the bottom is the three Glock magazines with the rounds

4  that were found there in the magazines.

5      Exhibit 8 is just a closer shot up of the Charter Arms

6  revolver with the serial number.

7  Q    Based upon -- and I know you touched on this a little bit

8  earlier -- based upon your prior training and experience, is it

9  common for individuals that are engaged in the trafficking of

10 cocaine, methamphetamine, or other controlled substances to

11 utilize multiple cellular telephones?

12 A    It is.

13 Q    And Mr. Gonzalez was using utilizing a cellular telephone

14 in this case so as to communicate with Demontre Morgan.  Is

15 that correct?

16 A    Actually, he used two separate cell phones to contact

17 Demontre and actually had him go to the push-to-talk or the

18 radio phone because drug traffickers commonly feel safer with a

19 radio phone as opposed to a regular phone.

20 Q    Did -- was -- at the time that Mr. Gonzalez was placed

21 under arrest, were any cell phones recovered?

22 A    There was approximately nine cell phones recovered.  One of

23 them was recovered inside a planter, actually inside the dirt,

24 as it was -- appeared to have been hidden.

25 Q    Were other cell phones located where the SIM card had been

1  pulled out and discarded?

2  A    There was at least two -- I've been told by the officers

3  there, there was at least two cell phones that were located

4  where the SIM cards had been removed.

5  Q    Did -- and you had mentioned this earlier as well.  You did

6  in fact have an occasion after Mr. Gonzalez was placed in

7  custody and advised of his Miranda warnings to talk to him.  Is

8  that correct?

9  A    We did.

10  Q    During the period of time that you met with Mr. Gonzalez,

11  did you play him one of the calls where he discusses providing

12  20 kilograms of cocaine to Demontre Morgan?

13  A    I did.

14  Q    Did he ever deny that that was him talking to Mr. Morgan?

15  A    No.

16  Q    Did you bring up with Mr. Gonzalez the fact that all these

17  weapons were found either at his residence or at cars that

18  could be linked back to him?

19  A    Yes.

20  Q    Did he in fact admit that those weapons belonged to him?

21  A    Yes.  He said that he liked weapons and he had bought these

22  at a gun show.

23         MR. CALVERT:  I'll pass the witness, Your Honor.

24  Thank you.

25         THE COURT:  Mr. Lechtenberger?

1                          CROSS-EXAMINATION

2    BY MR. LECHTENBERGER:

3    Q    Based on the last question by the prosecutor, would it be

4    fair to say and would you agree with me that all those weapons

5    are legal?

6    A    Yes, sir, to my knowledge.  I have not tested them for

7    being fully automatic.  We have turned them over to ATF for

8    testing.  But to my knowledge as of right now, the assault

9    weapons are semi-automatic.

10   Q    Certainly, Agent, you know what an auto sear is, correct?

11   A    I do.

12   Q    And certainly when you eyeball 1 through 8 inclusive, you

13   could probably tell readily whether there was an auto sear?

14   A    Well, without going into it internally, I cannot tell that

15   due to the fact that we have had several weapons recently that

16   were purchased as semi-automatic weapons that has been worked

17   on and made fully automatic.

18   Q    In this situation, though, at this point in time, on the

19   present day, you can't tell that they are illegal, correct?

20   A    That is correct.

21   Q    So, in other words, if you and I were just Joe Smith

22   walking down the street, we could go to Ray's Gun Store on

23   Sylvan and purchase 1 through 8.  Would that be fair to say?

24   Legally?

25   A    That is true.

1  Q    So none of these guns have suppressors.   None of them to

2  your knowledge at this point are fully auto.   They're not

3  short-barrel firearms.   Correct?

4  A    That is correct.

5  Q    So, in other words, if I was to mention 18 U.S.C. 924, you

6  would recognize that law as what ATF and the gun federal laws.

7  Correct?

8  A    That is correct.

9  Q    And you have not charged, nor has the Eastern District of

10 Virginia, charged Mr. Gonzalez with any type of gun violation?

11 A    Not at this point, no, sir.

12 Q    Incidentally, did Mr. Morgan, your, I guess, confidential

13 informant at this juncture, did he ever say words to the effect

14 that Mr. Gonzalez was somehow a violent person and used these

15 guns with his violent propensities?

16 A    He told us that he was fearful of Mr. Gonzalez.   That is

17 basically what he said.

18 Q    Well, but quite frankly, in our line of business, everyone

19 who turns over to the Government sometimes is going to say

20 that.   Right?

21 A    A lot of them do.   That's correct.

22 Q    Okay.   And most of the time, the vast majority of the time,

23 in fact, nothing ever happens?   That's just kind of word out on

24 the street, correct?

25 A    I wouldn't say anymore that it doesn't happen.   We're

1   starting to see where happens more often now than it used to.

2   Q   Well, as an agent and an officer of the Court, you've run

3   an NCIC and a TCIC on Mr. Gonzalez, right?

4   A   I have.

5   Q   Okay.  The bottom line is no criminal record?

6   A   There is no criminal record.

7   Q   Other than perhaps a misdemeanor for not having a good

8   driver's license at one point in time?

9   A   That is correct.

10  Q   Now, you indicated to the judge you used to work for the

11  State, the D.A.'s office?

12  A   I did.

13  Q   And those offenses, as far as driving with a license

14  suspended, are either a ticket offense or a Class B misdemeanor

15  offense, correct?

16  A   That is correct.

17  Q   So it's kind of just a rinky-dink deal, right?

18  A   I don't know whether you -- yes, sir, what's on his

19  criminal history is a, I believe, actually, a Class B

20  misdemeanor.

21  Q   Mr. Morgan, as far as NCIC, does he have any theft or moral

22  turpitude offenses that would impact his ability to tell the

23  truth to you?

24  A   He has got a criminal record, yes, sir.

25  Q   Well, specifically, does it have any type of impingement on

1  his character?  That is, any theft offenses, stealing anything,

2  fraud?

3  A   I believe he does have a fraud charge on there, as well as

4  an assault charge.

5  Q   So when you let the Court know about the reliability of

6  Demontre Morgan -- and he has an alias, right, and it's

7  Silverback?

8  A   That is correct.

9  Q   That he goes by Silverback on the street?

10  A   Yes, sir.

11  Q   And when you relay the credibility or trustworthiness to

12  Mr. Morgan, does it factor into play what he says in

13  relationship to a moral turpitude offense?

14  A   It would have factored into play if we didn't have the

15  recorded phone calls and the documents located in the house.

16  And the things that he was able to say, we were able to

17  corroborate.

18  Q   Has it ever come to pass, in your 20 years of doing this,

19  that perhaps a confidential informant who may have a moral

20  turpitude offense says it's cocaine, and then lo and behold it

21  turns out it's not cocaine but it's marijuana?  Has that ever

22  happened?

23  A   It has happened.  Yes, sir.

24  Q   So, when you've talked about eight to ten phone calls, was

25  the word specifically kilo, K-I-L-O, ever mentioned?

1  A    The word 21 was.  I don't remember the word kilo actually

2  ever being mentioned.

3  Q    Was the word "cocaine" ever mentioned?

4  A    No.

5  Q    Would it surprise you to know that Mr. Gonzalez's

6  contention would be that he was selling, he did tell you the

7  truth, as you testified moments before, but he was selling

8  marijuana as opposed to cocaine?  Would that surprise you?

9  A    Yes, sir, it would.

10  Q    Now, would a 21-pound or 21-kilo marijuana case be a big

11  deal in federal court?

12  A    21-kilo marijuana case?

13  Q    Yes, sir.

14  A    It would be a federal crime.  If you're asking if the

15  cocaine would be a bigger charge, then -- the cocaine?  Is that

16  what you're asking?

17  A    Yes, sir.  Well, let me phrase it this way.  I mean, you're

18  familiar with the sentencing guidelines and mandatory minimums,

19  right?

20  A    I am.

21  Q    Okay.  So if I were to say roughly 150 kilos would be

22  roughly 38, the judge would know what I'm talking about, you

23  would know what I'm talking about?

24  A    That is correct.

25  Q    Compare and contrast that to, say, 21 pounds or kilos of

1  marijuana.  That may put us at, what, Level 16, Level 14, give

2  or take?

3  A    Yes, sir.

4  Q    You wouldn't dispute that, right?

5  A    No, sir.

6  Q    So it's a game-changer, especially for the Eastern District

7  of Virginia, if lo and behold this turns out to be marijuana

8  and not cocaine, right?

9  A    It would be, for them.

10  Q    Okay.  So let's talk about that a little bit.  The ion

11  scanner that you mentioned to the judge at this Weather Vane

12  place, you said you did an ion scanner, or someone did.  Right?

13  A    Yes.  The DEA laboratory did.

14  Q    Well, who was it?  Was it a technician?  Was it a chemist?

15  Who actually did it?

16  A    It was a DEA --

17  Q    I don't --

18  A    It was a DEA chemist.

19  Q    Would it be fair to say, just from your 20 years of

20  experience and knowing about ion scanners -- and you know that,

21  right?

22  A    Yes, sir.

23  Q    That if I was to give you an example about walking in, say,

24  this courtroom, and we did an ion scan on this carpet, could it

25  possibly have traces of cocaine on it?

1  A    It could, but I don't think they would be to the -- I'm

2  looking for the right word -- I don't think they would be as

3  high a level as they found in that house.

4  Q    Do you have that report with you, by chance?

5  A    No, I don't.

6  Q    If I was to open up my billfold and pull out some currency,

7  I mean, you've heard scientists and you've been in trials where

8  there's traces of cocaine on all currency.

9  A    On a lot of currency, yes, sir.

10 Q    So a person like me, who doesn't use drugs, who's not a

11 drug dealer, who's a criminal defense lawyer, I may show you a

12 $100 bill, a $20 bill, a $50 bill, and an ion scanner hits all

13 over it.  Right?

14 A    That is correct.

15 Q    Did you find anything in the Weather Vane location that was

16 consistent with cocaine other than this ion scanner?

17 A    Yes, sir.

18 Q    What was that?

19 A    Packaging material that was located in the house.

20 Q    Like kilo wrappers?

21 A    It'd be kilo wrappers or the Ziploc baggies that is

22 consistent with putting cocaine in and wrapping it.  Also, we

23 also found Tupperware containers that was consistent with

24 methamphetamine and the transportation of methamphetamine that

25 also tested positive for methamphetamine.

Hale - Cross                                    31

1    Q    Did it test positive for marijuana, by chance?

2    A    We found no marijuana in the house, or residue of thereof.

3    Q    Would you agree with me that wrappers and kilo wrappers are

4    consistent with also marijuana usage or transportation?

5    A    Yes.

6    Q    Does Mr. Morgan smoke marijuana?

7    A    Not to my knowledge.

8    Q    Was a UA test given to see if he was hot when he was

9    arrested?

10   A    No, we do not normally do that when they're arrested

11   immediately.

12   Q    We established earlier that Mr. Gonzalez has no record,

13   correct?

14   A    That is correct.

15   Q    And you did tell the judge that Mr. Gonzalez, when he

16   discussed things with you -- and you Mirandized him, right?

17   A    Yes, sir.

18   Q    So he freely talked to you at that juncture and did not

19   deny that that was his voice on the phone call?

20   A    He never denied -- he never admitted or denied to it.

21   Q    Well, he --

22   A    He -- he --

23   Q    I'm sorry.  I apologize.

24   A    He --

25   Q    Go ahead, sir.

1  A   We played the call for him and he did not deny that it was

2  his voice.

3  Q   Did it seem to you that he was resigned to the fact that

4  you'd caught him?

5  A   No, sir.  Actually, after that fact I believe it is that he

6  asked for his attorney and described who you were and we

7  contacted your investigator at that point.

8  Q   Yeah, I don't blend very well, do I?  You picked right up

9  on who he was asking for?

10 A   When he said tall and first name Kirk, we kind of knew who

11 it was.

12 Q   Fair enough.  Is it your information and your knowledge

13 that the agents who did arrest Mr. Gonzalez would say that he

14 was nice to them?

15 A   No, sir.

16 Q   He was not nice to them?

17 A   No, sir.

18 Q   Was he cooperative to you?

19 A   He was cooperative to me.

20 Q   Was he polite to you?

21 A   He was.

22 Q   Was he respectful to you?

23 A   To me he was.

24 Q   And certainly, as you indicated to Mr. Calvert on direct

25 examination about throwing phones away, sometimes when people

1    throw phones away those people are going to flee, correct?

2    A    At times, yes, sir.

3    Q    This was not a situation or a dynamic with Mr. Gonzalez

4    fleeing, because he was at his house with his wife, correct?

5    A    That is correct.

6    Q    And you know that his wife and his kids and his friends

7    were there when that search warrant was executed, right?

8    A    Yes, sir.  A lady named Blanca was there.  I was not

9    present there at the time, but yes, sir, and there was two

10   other individuals.

11   Q    However, as the main case agent or one of the main case

12   agents, you know that they opened the door for the agents, no

13   hard time to the agents?

14   A    According to the agents, they were given a hard time at the

15   time of the arrest, and that they -- that Mr. Gonzalez was very

16   rude to the agents.

17   Q    Was that before or after the agents pointed the guns at his

18   kids and Mr. Gonzalez?

19   A    I don't know at which point.  I just spoke with the agents

20   that was there, and they indicated that he was very

21   uncooperative to them.

22   Q    In any event, no type of obstruction cases were filed or

23   any type of assault of a federal official, correct?

24   A    That is correct.

25            MR. LECHTENBERGER:  Can I have a moment, Your Honor?

 1              THE COURT:  Yes.

 2       (Pause.)

 3  BY MR. LECHTENBERGER:

 4  Q   Agent, a few last -- a couple questions.  Mr. Gonzalez,

 5  when you were doing his background check, did you see where he

 6  does not have a passport?

 7  A   Actually, I'm not the one who did that, and I have not seen

 8  the results of that yet.

 9  Q   He is a U.S. citizen, correct?

10  A   To my knowledge, he is.

11  Q   Were you able to verify that he has applied and committed

12  -- or I should say completed -- 99 percent of a concealed

13  weapons permit course about two years ago?

14  A   I do not know that.

15  Q   Thank you, sir.

16          MR. LECHTENBERGER:  Thank you, Your Honor.

17          THE COURT:  Okay.  Mr. Calvert?

18          MR. CALVERT:  Briefly, Your Honor.

19                      REDIRECT EXAMINATION

20  BY MR. CALVERT:

21  Q   Agent, in your experience, when an individual chooses the

22  life of a drug dealer, whether that be cocaine, methamphetamine

23  or marijuana, does he run the risk of having law enforcement

24  or, actually, worse, other drug dealers point weapons at he or

25  his family?

1    A    He does.

2    Q    Is that a choice that he made?

3    A    That is correct.

4    Q    In your prior training and experience, do you have an

5    opinion on whether an individual that provides upwards of 150

6    kilograms of cocaine to a customer is a major distributor?

7    A    He is a major distributor.  Yes, sir.

8    Q    Would you characterize Mr. Gonzalez as a major distributor?

9    A    I would.

10   Q    On a couple of occasions, you have referenced a witness in

11   Virginia who, although he did not know the name of the source

12   of supply, he identified him as a young Hispanic male with gold

13   teeth.  Do you recall that testimony?

14   A    I do.

15   Q    Do you know whether or not, in his discussions with law

16   enforcement in Virginia, he referenced a marijuana deal or a

17   cocaine deal?

18   A    All the individuals involved in this conspiracy that has

19   either gave testimony in the Virginia grand jury or has

20   cooperated with law enforcement have indicated cocaine, and to

21   my knowledge there has been no talk of marijuana.

22   Q    All right.  And do you know whether or not, off the top of

23   your head, as a result of the investigation in Virginia,

24   whether any type of seizures were made?

25   A    There have been seizures made.  I don't know to which --

1  what quantity, because they have been working on this for a

2  long time, but I do know there have been seizures made, and it

3  was cocaine.

4  Q   All right.  And Mr. Morgan, it would be a self-serving

5  statement to him to say that he was trafficking marijuana up to

6  Virginia.  Would that not be true?

7  A   It would be.

8          MR. LECHTENBERGER:  Objection, speculation at this

9  point.

10         THE COURT:  I think he can answer that.  Go right

11 ahead.

12 BY MR. CALVERT:

13 Q   Would that be true?

14 A   That is true.

15 Q   At all times, has Mr. Morgan been consistent with the fact

16 that he provided the cocaine up in Virginia that is the target

17 of this investigation?

18 A   He has been, from the time we arrested him until current.

19 Has never indicated that there was any marijuana involved, that

20 everything that he transported was cocaine.

21 Q   And did he also indicate that all of that cocaine came from

22 Mr. Gonzalez?

23 A   He did.

24 Q   And as far as his truth or veracity, have you found

25 anything in this investigation that that shown him to have not

1  been truthful in what he has told to either you or other law

2  enforcement agents?

3  A    I have not.

4  Q    In regard to the kilo wrappers or the materials found at

5  the stash house, you indicated they all tested positive for

6  either cocaine or methamphetamine.  Is that correct?

7  A    That is correct.

8  Q    The phone he indicated that Mr. Gonzalez was using, you

9  found Mr. Gonzalez, at least at his residence, with nine cell

10  phones.  Is that correct?

11  A    That is correct.

12  Q    The vehicle that Mr. Gonzalez uses was eyed by surveillance

13  officers at the stash house.  Is that correct?

14  A    That is correct.

15  Q    And Mr. Gonzalez himself, as you've noted, has not denied

16  that that is he making a drug-related telephone conversation

17  with Demontre Morgan?

18  A    That is correct.

19  Q    Do you know whether or not this defendant is in any way

20  gainfully employed?

21  A    We have asked him that.  He said that he is not employed,

22  that he sells cars on the street.  That he goes to the auction

23  and gets cars and then he sells them out on the street at

24  times.  He did say that he was -- I believe it was his father

25  or father-in-law he was helping with a tire shop, but that it

Hale - Redirect                                38

1   was not doing very well.

2   Q   You did locate luxury items, however, at his residence.   Is

3   that correct?

4   A   We did.

5   Q   What types of things?

6   A   There were, from my understanding from the agents there,

7   there were high-dollar shoes.   And I'm trying to think the name

8   that they used.   The name has left me.   That there were several

9   high-dollar --

10   Q   Louis Vuitton?   Gucci?

11   A   Louis Vuitton.   Gucci.

12   Q   High-end retail?

13   A   Very high-end retail items that were located in the house.

14   Q   In your 20 or so, 20-plus years of investigating drug-

15   related offenses, on few or many occasions have you utilized a

16   Title III wiretap?

17   A   We have.

18   Q   Any idea how many times, how many Title III's you've been a

19   part of?

20   A   Several hundred.

21   Q   All right.   And in those several hundred Title III

22   wiretaps, can you tell the Court how many times you intercepted

23   a call where one drug distributor said to another, "I would

24   like to order up some cocaine"?

25   A   Never.

1  Q    Thank you, sir.

2           MR. LECHTENBERGER:  Conclude with --

3           THE COURT:  Go right ahead.

4                     RECROSS-EXAMINATION

5  BY MR. LECHTENBERGER:

6  Q    As far as the word cocaine, however, if I mention the

7  phrase to you "drug jargon," you would understand what that

8  phrase means, correct?

9  A    I do.

10 Q    Everybody can have different interpretations, correct?

11 A    Mainly the cocaine traffickers use certain jargon and the

12 -- or, cocaine traffickers use certain words and marijuana

13 traffickers use certain words.

14 Q    So if I were to call my paralegal who's sitting with the

15 pad in the chair and I say, "Florence, I need 20 shirts.  Make

16 that actually 21 shirts," that could mean theoretically 21

17 kilos of cocaine, correct?

18 A    That is correct.

19 Q    It could mean theoretically 21 kilos of methamphetamine,

20 correct?

21 A    It could.

22 Q    It could mean 21 kilos of marijuana, correct?

23 A    I haven't heard shirts referred to as marijuana, honestly.

24 Q    Just -- just take a noun, any noun.

25 A    Right.

1  Q    Tire.  Shirts.  Baseball bats.  You name it.

2  A    Is the possibility of it?

3  Q    Yes, sir.

4  A    Yes, sir.

5  Q    And certainly when we talk about marijuana, a lot of people

6  actually don't even use the metric system, they use the English

7  system.  So it would be 21 pounds if someone said, "Hey,

8  Florence, 21 shirts."  Correct?

9  A    No, sir.  Most of my experience in the wiretaps and

10 conducting drug investigations, most large-scale drug

11 traffickers use kilo quantities.

12 Q    Well, the bottom line is this.  Whether it's kilos or

13 pounds, was there anything 100 percent that you can tell this

14 judge under oath that lets you know in those conversations,

15 those eight to nine to ten conversations, that it was kilos of

16 cocaine versus kilos of marijuana?

17 A    Based upon my experience, after listening to several

18 hundred if not thousands of telephone calls, on the way they

19 were talking to each other, there was no doubt they were

20 talking about cocaine.  If I didn't know what the situation was

21 with either one of them, listening to the phone calls, I would

22 have believed at that point that the conversation concerned

23 cocaine.

24 Q    Well, how about this.  I was kind of hoping you were going

25 to say sure, Kirk, if they talked some type of numbers.

1   Because you and I can have the agreement that a wholesale value

2   of cocaine in Dallas is different than, say, a wholesale value

3   of a kilo of marijuana in Dallas, right?

4   A    That is correct.

5   Q    Even if it's hydroponic marijuana, correct?

6   A    That is correct.

7   Q    Say with a high THC value of 20, 21 percent even.  Correct?

8   A    That is correct.

9   Q    Okay.  So, your knowledge base as far as marijuana in

10  Dallas, hydroponic, 21 percent, my hypothetical, would be what

11  for a pound?  $3,500?  $4,000?

12  A    $3,000 to $4,000, depending on who they were getting it

13  from.

14  Q    Okay.  And there's 2.2 pounds per kilo, correct?

15  A    That is correct.

16  Q    Okay.  So, using your arithmetic, that would be about 10

17  grand per kilo, correct?  For marijuana?

18  A    Correct.

19  Q    Okay.  So, in these eight to nine to ten conversations,

20  were any type of amounts discussed?  Money?

21  A    Of money?

22  Q    Yes, sir.

23  A    No.

24          MR. LECHTENBERGER:  That's all I have.

25          THE COURT:  You may step down.

1              MR. CALVERT:  Thank you, Your Honor.  That's all we

2    have.  The Government rests.

3              MR. LECHTENBERGER:  I have three brief witnesses, Your

4    Honor.

5              THE COURT:  Yes, sir.  Go right ahead.

6              MR. LECHTENBERGER:  I call Ms. Walker first, Your

7    Honor.

8        (The witness is sworn.)

9              MR. LECHTENBERGER:  May I proceed?

10             THE COURT:  Yes.

11            WHITNEY WALKER, DEFENDANT'S WITNESS, SWORN

12                       DIRECT EXAMINATION

13   BY MR. LECHTENBERGER:

14   Q   Ms. Walker, up until about 30 minutes ago -- I apologize.

15   I'm so sorry.  Ma'am, could you state your record?  State your

16   record?  Could you state your name?

17   A   I don't have a record.

18   Q   I apologize.  Could you state your name for the Court,

19   please?

20   A   Whitney Anne Walker.

21   Q   Ms. Walker, I just met you roughly an hour ago?

22   A   Yes, sir.

23   Q   However, we spoke yesterday?

24   A   Yes, sir.

25   Q   And there are a few rules in court, and I'll hope everybody

1   hears this.  You've got to keep your voice up.  Okay?

2   A    Yes, sir.

3   Q    You can't say uh-huh or huh-uh.  Fair enough?

4   A    Yes, sir.

5   Q    And I don't mean that disrespectfully.  I apologize.  And

6   if you don't understand a question, just say, "Kirk, I don't

7   understand."  Is that agreeable?

8   A    Absolutely.

9   Q    Ms. Walker, I contacted you because you know Oscar

10  Gonzalez.  Would that be fair to say?

11  A    Yes, sir.

12  Q    And I went over some rules that federal court has to

13  follow.  And we talked for probably about an hour yesterday.

14  Would that be give or take correct?

15  A    Yes, sir.

16  Q    And I said that the judge would need to know certain things

17  about the person's character or the person's physical and

18  mental condition, family ties.  And we covered that in pretty

19  significant detail?

20  A    Yes, sir.

21  Q    To that end, how do you know Oscar Gonzalez?

22  A    Well, I've known Oscar since he was about seven years old.

23  Q    How so?

24  A    His mother is one of my dear friends and has been an

25  employee for 19 years.  Also, eight of his other family members

1   have worked for me over the last 20 years.  And I also know his

2   family up to 26 years ago because I met Angelica, his mother,

3   through another employee who is related to her.  I know

4   probably 40 family members.  They don't drink alcohol.  They go

5   to church.  They've very responsible.  And I am completely

6   surprised at -- well, excuse me.

7   Q   Well, whether you're surprised or not, let's just go --

8   A   Yeah.

9   Q   -- with the tenor of some of the questions --

10  A   Yeah.

11  Q   -- in regards to Mr. Gonzalez's background.  Would that be

12  okay?

13  A   I would never imagine any -- I'll be quiet.  Thank you.

14  Q   So, Ms. Walker, you had indicated that in your capacity, in

15  your job, that you employ these folks.

16  A   Yes.

17  Q   What do you do for a living?

18  A   I'm CEO of the Antique Drapery Rod Company.  We make

19  drapery hardware, household accessories.

20  Q   In fact, is your father also here in the second row, along

21  with some of the family friends in the first row and third row?

22  A   Yes.  He's the president and has been with our company for

23  18 years.

24  Q   And your father has a military background?

25  A   Ex-Marine jet fighter pilot, Navy test pilot.

1          MR. LECHTENBERGER:  Can I approach the witness?

2          THE COURT:  Yes.

3   BY MR. LECHTENBERGER:

4   Q   I'm showing you documents I've previously marked as Defense

5   Exhibit #1 and 2.  Do you recognize these documents, Ms.

6   Walker?

7   A   Yes, sir.

8   Q   Does 1 reflect your job as well as Mr. Gonzalez's mother in

9   one of the pictures?

10  A   Yes.

11  Q   And not to get in your personal space, ma'am, but does X

12  mark the spot as far as Mr. Gonzalez's mother?

13  A   Yes, it does.

14  Q   Now, #2 is what?

15  A   It's a letter that I generated.  It's a very short letter

16  of reference for Angelica and her family.  As I said, they've

17  worked for me off and on for 20 to 25 years.  And they're very,

18  very responsible, ethical.  They're a very good family.

19  Q   And does this go to how you know the character of Mr.

20  Gonzalez as well as all of his family members and his ties in

21  the community?

22  A   Yes, sir.

23          MR. LECHTENBERGER:  I show #1 and 2 to the Government.

24  Move for admittance.

25          MR. CALVERT:  No objection.

1          THE COURT:  They're admitted.

2          MR. LECHTENBERGER:  Publish to the Court?

3          THE COURT:  Yes.

4     (Defendant's Exhibits 1 and 2 are received into evidence.)

5  BY MR. LECHTENBERGER:

6  Q   We left off discussing that you've known the family for 20-

7  plus years?

8  A   Yes, sir.

9  Q   You'd agree with me that perhaps you don't see Oscar on a

10  day-to-day basis, but do you come in contact with him weekly,

11  monthly?

12  A   Monthly and at holiday parties sometimes.  And also through

13  his mom.  She tells me what both Oscar and his sister are doing

14  all the time.

15  Q   And you recognize again the mother and the sister and --

16  A   Yes.

17  Q   -- Mr. Gonzalez's wife in the front row?

18  A   Yes.

19  Q   Would you describe Oscar Gonzalez as honest?

20  A   Yes, sir.

21  Q   As hard-working?

22  A   Yes, sir.

23  Q   As trustworthy?

24  A   Yes, sir.

25  Q   As intelligent?

1  A    Yes, sir.

2  Q    That he could follow rules?

3  A    Yes, sir.

4  Q    That he's courteous?

5  A    And a very good son.

6  Q    A good father?

7  A    As far as I know, yes, sir.

8  Q    Willing to comply with instructions, for instance, from a

9  boss?

10  A    Yes, sir.

11  Q    Or willing to comply with instructions, say, as an example,

12  from a judge?

13  A    Yes, sir.

14  Q    Ms. Walker, I asked you yesterday if I could use the verb

15  choice "vouch" with you.  Do you remember me talking to you

16  about that?

17  A    Yes, sir.

18  Q    And you and I had the understanding that that word "vouch"

19  means that you could represent honestly, truthfully, from your

20  heart of hearts, --

21  A    Uh-huh.

22  Q    -- to the judge that this man, if the judge saw fit to give

23  him a bond, will not do something stupid?

24  A    I absolutely believe he would not do anything stupid, no.

25  Q    And when I say stupid, that would mean, for instance, to

1  flee.

2  A    Oh, no, he has children here.

3  Q    That he would commit another offense?

4  A    Of course not.

5  Q    Or specifically as the Government alleges, that he would be

6  some type of danger to the community?

7  A    The entire family is very peaceful.  Very peaceful.

8  They're very sweet people.

9  Q    Have you ever, to that extent, seen Oscar Gonzalez ever

10 have violent propensities?  That is, to be aggressive?

11 A    No.

12 Q    Provocative?

13 A    No.

14 Q    Or to use profane or foul language to someone who's in

15 authority?

16 A    No.

17 Q    Now, I didn't go into great detail about this drug offense

18 because, well, we were pressed for time.  But you understand

19 this is a significant drug offense?

20 A    Yes.

21 Q    I explained to you that the presumption unfortunately is a

22 little bit against us?

23 A    Yes, sir.

24 Q    Thus the reason why I tried to discuss with you about

25 vouching.  Sometimes judges in this district and other

1   districts will say, and they'll turn to the person, "Okay,

2   ma'am, I'm holding you responsible.  I'm going to put

3   electronic monitoring on him, I'm going to put GPS on him, I'm

4   going to have him have a curfew, he's going to have to show up

5   here once a week, and if he still has any type of driver's

6   problems, you are going to have to drive him.  Do I have that

7   understanding with you?"

8        So if a judge, bottom line, --

9   A   Uh-huh.

10  Q   -- asked you that, would you say yes?

11  A   Are you saying -- yes, yes, I would say he would be a very

12  good boy.  Did I answer that correctly?

13  Q   You did.

14  A   I mean, I don't -- I'm not sure I understood completely.

15  Q   Ms. Walker, perhaps I didn't phrase it very artfully.

16  A   Yeah.  Yeah.

17  Q   The bottom line is that your opinion of 20-plus years of

18  Mr. Gonzalez is that he's not a danger to the community?

19  A   No, he's a very nice young man.

20  Q   He's not going to flee the community?

21  A   No.

22  Q   He'll do whatever the judge says?

23  A   Yes, sir.

24           MR. LECHTENBERGER:  Pass the witness.

25           THE WITNESS:  Do I leave now?

 1                THE COURT:  No, ma'am.

 2                          CROSS-EXAMINATION

 3   BY MR. CALVERT:

 4   Q   Ms. Walker, my name is Rick Calvert.  I'm the Assistant

 5   United States Attorney.  Thank you for being here today.  Have

 6   you ever testified in a court before?

 7   A   No, sir.

 8   Q   I know it's a stressful situation and new to you.  I'm not

 9   trying to trick you in any way.  If I ask a question that you

10   don't understand, just please ask me to rephrase it.  Okay?

11   A   Yes, sir.

12   Q   I just have a couple of questions for you.  You have

13   characterized the Defendant as honest, correct?

14   A   Yes, sir.

15   Q   Hard-working?

16   A   Yes, sir.

17   Q   Trustworthy?

18   A   Yes, sir.

19   Q   Intelligent?

20   A   Yes, sir.

21   Q   A good son?

22   A   Yes, sir.

23   Q   How about law-abiding?  Is he law-abiding?

24   A   As far as I've always known, yes, sir.

25   Q   All right.  And that kind of puts me down the path that I

1   want to explore with you next.  Would you agree with me that

2   you can think you know a person's character and you can think

3   you know whether they're honest and trustworthy and intelligent

4   and a good son and don't drink alcohol and go to church, when

5   the reality is they're very different from what you think they

6   are?  That can happen, correct?

7   A    Theoretically, yes, sir.

8   Q    All right.  And you've sat here in court today throughout

9   this entire proceeding.  Is that correct?

10  A    Yes, sir.

11  Q    And you have heard defense counsel come up here and admit

12  that the man that you identify as honest, hard-working,

13  trustworthy, intelligent, good son, and law-abiding is a drug

14  dealer.  Correct?

15  A    I don't --

16  Q    He has admitted that he was distributing marijuana, not

17  cocaine?  You heard that, correct?

18  A    I may not have interpreted it exactly that way.

19  Q    All right.  Well, let me ask you hypothetically.  Let's say

20  that defense counsel's position in this hearing is that, yes,

21  Oscar Gonzalez is a drug dealer and he distributes marijuana,

22  but he does not distribute cocaine.  Just assume that for me,

23  okay?  Would that not change your view that you know this man

24  to be a law-abiding man?

25  A    He has never been in any kind of trouble his entire life.

1   Q   And ma'am, I understand that, and that's not my question.

2   And again, I'm not trying to trick you, and maybe I didn't ask

3   it correctly.  Let me ask it again.  And it really just calls

4   for a yes or no answer.

5   A   Okay.

6   Q   If you learned today hypothetically that the fact is that

7   the Oscar Gonzalez you thought you knew is a drug dealer,

8   whether that be a marijuana distributor or a cocaine

9   distributor, would that change your perception and view of him

10  that he is law-abiding, trustworthy and honest?

11  A   If that were true.

12  Q   Okay.  That's fair enough.  Thank you, ma'am.  Do you know

13  whether -- do you know where Mr. Gonzalez lives?

14  A   I know roughly.

15  Q   And it's an apartment complex over off of Garland Road.  Is

16  that correct?

17  A   I've never been there.

18  Q   Do you know -- well, when you say roughly, what do you mean

19  by that?

20  A   Well, I know there are apartment complexes off Garland Road

21  that different family members live in that area.

22  Q   All right.

23  A   I've never been to that area.

24  Q   Do you know why Mr. Gonzalez would utilize a residence at

25  3017 Weather Vane Road?

1  A   I don't know that that is Mr. Gonzalez's residence.

2  Q   Well, you've heard testimony that he was there.  You heard

3  that, correct?

4  A   That doesn't mean it's his property.

5  Q   And again, maybe I'm misphrasing the question.  Do you know

6  why he would be at that location?

7  A   I have no idea why.

8  Q   If I told you that bills and paperwork with his name on it

9  and his address over at the Magellan apartment complex were

10 found all inside that Weather Vane residence, do you know why

11 that would be?

12 A   No, sir.

13 Q   If I told you that Mr. Gonzalez, the individual again

14 you've identified as honest, hard-working, trustworthy,

15 intelligent, law-abiding, and a very good boy, was intercepted

16 and recorded talking to a convicted felon about distributing

17 either 20 kilograms or pounds of marijuana or 20 kilograms of

18 cocaine, would that make you rethink how well you know him?

19 A   I would be extremely surprised to find that was true.

20 Q   And if it was, you would agree with me you don't know him

21 nearly as well as you thought you did?  True?

22 A   Of course.

23 Q   What does Mr. Gonzalez do in his free time?

24 A   I know that he runs -- is part of the family tire shop.

25 Q   Okay.  Is he an avid hunter?

1  A    As far as I know, the entire family is very peaceful.

2  Q    Okay.

3          MR. CALVERT:  May I approach, Your Honor?

4          THE COURT:  Yes.

5          THE WITNESS:  Yeah.

6  BY MR. CALVERT:

7  Q    Do you know anything about guns, ma'am?

8  A    I shoot sporting clays at the Dallas Gun Club.

9  Q    Great.  Would you take a look at Governments Exhibit #1,

10 and I'll ask you if you've ever seen firearms like that before.

11 Especially the one in the top right.  Do you recognize what

12 that is?

13 A    No.  I'm sorry, I don't.

14 Q    Okay.  If I told you that was an assault weapon that was

15 found in a vehicle that belongs to the hard-working good boy

16 that you've characterized here in court today, would you know

17 what he would use that for?

18 A    No, sir, but I do know that some people collect guns like

19 that.

20 Q    All right.  Let me flip over to Page 2.  Here's another

21 assault weapon.  Do you know why Mr. Gonzalez would have that

22 particular weapon?

23 A    Possibly because he's a young boy and he thinks it's cool.

24 Q    Okay.  And let's look over -- and I don't know if you were

25 paying close attention, but on Government's Exhibit #3, do you

1   know what that top right-hand picture is?  That's a 100-round

2   drum called a street sweeper.  Have you ever -- did you hear

3   Agent Hale's testimony as to that?

4   A    Yes, sir, I did.

5   Q    All right.  And did you hear Agent Hale testify that those

6   types of devices are used so they can clip onto a gun and just

7   randomly spray out in the street without needing to aim or

8   reload?  Did you hear him testify to that?

9   A    Yes, sir.  I've also seen semi-automatic rifles used dove

10  hunting.

11  Q    Yes, okay, and that's -- thank you, ma'am.  Do you know Mr.

12  Gonzalez to be an avid dove hunter?

13  A    (no immediate response)

14  Q    Yes or no?

15  A    Not at this time, but --

16  Q    Okay.  And in the -- do you know any dove hunters?

17  A    Many.

18  Q    Many?  Okay.  And of those dove hunters, how many of those

19  individuals take a 100-round clip and attach it to an assault

20  rifle to shoot doves?  How many do you know?

21  A    I would -- I would say that there are some men who are very

22  childish with guns and what they collect doesn't always make

23  sense.

24  Q    All right.  Do you know anything about, from TV or movies

25  or books you've seen, what type of weapons gun dealers -- gun

1  -- excuse me, drug distributors use?

2  A    Absolutely not.

3           MR. LECHTENBERGER:  At this point I would object to

4  relevance.  It's outside of the scope of my direct examination.

5           THE COURT:  I'm going to sustain that.

6  BY MR. CALVERT:

7  Q    How often did you see Mr. Gonzalez?

8  A    Several times a year, if not more often.  He takes very

9  good care of his mother, but not in a pretentious way.

10 Q    Thank you, ma'am.

11          MR. CALVERT:  I'll pass the witness.

12          MR. LECHTENBERGER:  Thank you, Ms. Walker.

13          THE WITNESS:  Thank you.

14          THE COURT:  No more questions?

15          MR. LECHTENBERGER:  Ask that she be allowed to step

16 down.

17          THE COURT:  No more questions?

18          MR. LECHTENBERGER:  Nothing further, Your Honor.

19          THE COURT:  You may step down.

20          THE WITNESS:  Thank you.

21     (The witness steps down.)

22          MR. LECHTENBERGER:  I'd call Ms. Gonzalez, Mr.

23 Gonzalez's mother.

24     (The witness is sworn.)

25          THE COURT:  Ma'am, you need to speak up, because there

1   is a recording being made and it won't pick you up unless you

2   speak up.  You may need to pull the microphone down just a

3   little bit.

4          PARSABANA ANGELICA GONZALEZ, DEFENDANT'S WITNESS, SWORN

5                          DIRECT EXAMINATION

6   BY MR. LECHTENBERGER:

7   Q   Ms. Gonzalez, you're going to have to speak up.  Okay?

8   A   Yes, sir.

9   Q   Tell the Court your name again, please.

10  A   My name is Angelica Gonzalez.  I'm mother to Oscar

11  Gonzalez.

12  Q   Ms. Gonzalez, go real slow.  You have a strong accent.

13  Okay?

14  A   Yes.

15  Q   And I know you're very emotional and nervous right now.

16  Yes?

17  A   Yes, sir.

18  Q   Okay.  But you've got to keep your voice up.  Fair enough?

19  A   Yes, sir.

20  Q   This is your son --

21          THE COURT:  Before you --

22          MR. LECHTENBERGER:  -- to my left?

23          THE COURT:  Before you go on, --

24          THE WITNESS:  Yes, sir.

25          THE COURT:  -- will you please have her spell her

1  first name for us?

2         MR. LECHTENBERGER:  I apologize.

3         THE COURT:  Thank you.

4  BY MR. LECHTENBERGER:

5  Q   Spell your first name, ma'am.

6  A   My first name is Parsabana Angelica.

7  Q   Okay.  Go slowly and spell it.

8  A   P-A-R-S-A-B-A-N-A.

9         MR. LECHTENBERGER:  I'm sorry, Judge.

10        THE COURT:  Go right ahead.

11  BY MR. LECHTENBERGER:

12  Q   Is it okay if I refer to you as Ms. Gonzalez?

13  A   Yes, sir.

14  Q   How old is your son?

15  A   Twenty-six.

16  Q   Some of the same questions I asked Ms. Walker.  Is he

17  honest?

18  A   Yes, sir.

19  Q   Is he hard-working?

20  A   Yes, sir.

21  Q   Is he trustworthy?

22  A   Yes, sir.

23  Q   Is he intelligent?

24  A   Yes, sir.

25  Q   Tell me about Oscar Gonzalez, your son, as far as being a

1  good father.

2  A    He's a good father.

3  Q    Give me an example.

4  A    He take the kids all the time.  He play with them.  And go

5  to the park and play with them and --

6  Q    Have you ever known your son, just recently, in the past

7  couple weeks, to take his two children to Chuck E. Cheese?

8  A    Yes, sir.

9  Q    Does Oscar do his homework with his children?

10  A    Yes, sir.

11  Q    Has he been married to his wife for eight years?

12  A    Yes, sir.

13  Q    When you ask Oscar to do something, does he do it for you?

14  A    Yes, sir.

15  Q    Does he help you with chores around the house on the

16  weekends?

17  A    Yes, sir.

18  Q    So, in other words, does Oscar follow the rules and

19  instructions?

20  A    Yes, sir.

21  Q    Where do you live?

22  A    I live in Pleasant Grove.

23  Q    Do you see your son often?

24  A    Yes, sir.

25  Q    Now, the folks on the first row, other than my paralegal,

1   that's your daughter and that's your daughter-in-law?

2   A    Yes, sir.

3   Q    And the folks in the second and third row, those are family

4   members?   Your relatives and friends?

5   A    Yes, sir.

6   Q    And they're here to show Judge Toliver the support of the

7   community?

8   A    Yes, sir.

9   Q    Have you ever seen your son abuse drugs?

10   A    No, sir.

11   Q    Have you ever seen your son abuse alcohol?

12   A    No, sir.

13   Q    Your son went to high school in Dallas?

14   A    Yes, sir.

15   Q    And he graduated?

16   A    High school.

17   Q    Bryan Adams High School?

18   A    Yes, sir.

19   Q    He was a B-minus student?

20   A    Was good student.

21   Q    Did he give you a hard time in high school?

22   A    No.

23   Q    If I ask you to promise the judge to look after, to take

24   care of Oscar, could you do that?

25   A    Yes, sir.

1  Q   And the judge has a little bit of a tough decision that

2  she's going to have to make.  And I've talked to you about

3  that?

4  A   Yes, sir.

5  Q   If the judge were to ask you and everyone else in the

6  community to make sure that Oscar does what he's supposed to

7  do, and the judge were to give Oscar a bond, --

8  A   Yes, sir.

9  Q   -- could you represent and tell the judge that that would

10 be done, 100 percent?

11 A   Yes, sir.

12 Q   And even one small mistake would mean he comes back in here

13 and he gets to go back to jail?

14 A   Yes.  I promise.

15 Q   Where is the tire shop?

16 A   Where?

17 Q   Yes.

18 A   In Pleasant Grove.

19 Q   Is it doing okay or not so okay?

20 A   Well, it's slow, but it's okay.

21 Q   Did I ask you all to try to take some pictures of the tire

22 shop today?

23 A   I don't got right now.

24 Q   So, we just didn't have time to take pictures, but we tried

25 to?

1  A    Yes, sir.

2  Q    And also does your son go out and buy cars from time to

3  time?

4  A    Yeah, he buy cars.

5  Q    The cars that Oscar buys, does he go to auctions or does he

6  go to friends and buy these cars?

7  A    Yes, sir.

8  Q    Does he then, with his own hands, take those cars and

9  rebuild them or rework them?

10  A    Yes, sir.

11  Q    Do you know what a salvage title is?

12  A    No, sir.

13  Q    Well, then don't worry about it.

14          MR. LECHTENBERGER:  May I have a moment, Your Honor?

15          THE COURT:  Yes.

16      (Pause.)

17          MR. LECHTENBERGER:  Ms. Gonzalez, thank you, ma'am.

18      I'll pass the witness, Your Honor.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Ma'am, you have to be seated.

21          THE WITNESS:  Oh, stay?

22          MR. CALVERT:  The Government has no questions of Mrs.

23  Gonzalez, Your Honor.

24          THE COURT:  Okay.  Now you can go.

25          THE WITNESS:  Now I can?

 1              THE COURT:  You can step down.

 2              THE WITNESS:  Thank you.

 3         (The witness steps down.)

 4              MR. LECHTENBERGER:  The third and last witness will be

 5    Ms. Gonzalez, the younger one, Your Honor.

 6         May I have the Court's permission just to stand down for

 7    ten seconds, Your Honor?

 8              THE COURT:  Of course.

 9              MR. LECHTENBERGER:  Go on up, Ms. Gonzalez.

10              THE COURT:  Just a minute, Angela, until he's --

11         (Pause.)

12              MR. LECHTENBERGER:  Thank you, Your Honor.  That was

13    ten seconds.

14              THE COURT:  Okay.

15         (The witness is sworn.)

16              THE COURT:  You need to speak up as well.

17              THE WITNESS:  Yes.

18              THE COURT:  Thank you.

19             VANESSA GONZALEZ, DEFENDANT'S WITNESS, SWORN

20                        DIRECT EXAMINATION

21    BY MR. LECHTENBERGER:

22    Q   Ms. Gonzalez, please state your name and spell it slowly.

23    A   Okay.  My name is Vanessa Gonzalez.  It's spelled V-A-N-E-

24    S-S-A.

25    Q   Now, the other Ms. Gonzalez who just testified is your

1   mother?

2   A    Right.  Correct.

3   Q    And the person to my left, Oscar, is your brother?

4   A    Yes.

5   Q    How old are you, ma'am?

6   A    Twenty-four.

7   Q    What do you do for a living, ma'am?

8   A    I work for an attorney and a shoe store.

9   Q    You work for an attorney and at a shoe store?

10  A    Yes.

11  Q    Now, I asked you earlier about the attorney.  It's an

12  immigration attorney?

13  A    Yes.

14  Q    What's his name or her name?

15  A    Noel Anthony Suniga.

16  Q    Have you ever testified before?

17  A    No, I haven't.

18  Q    A little bit nervous?

19  A    Yes.

20  Q    You mentioned that you sold shoes.

21  A    Yes.

22  Q    Just incidentally, if I were to mention the phrase knock-

23  offs, would you know what that phrase means?

24  A    Yes.

25  Q    So if, I don't know, an agent said that there was Louis

1   Vuitton or Gucci shoes or purses, do we know if those were

2   authentic or could they have been knock-offs?

3   A    They could have been knock-offs.

4   Q    Do people sometimes in your community, and no disrespect,

5   but do they sometimes wear what appears to be high-end stuff

6   and it's knock-offs?

7   A    Yes.

8   Q    Watches, even?

9   A    Yes.

10  Q    Suits, even?

11  A    Yes.

12  Q    Getting back on track and talking about Oscar, is he your

13  older brother?

14  A    Yes.

15  Q    Did he in fact go to Bryan Adams High School?

16  A    Yes.

17  Q    Did he graduate?

18  A    Yes.

19  Q    B-minus?

20  A    Yes.

21  Q    Good student?

22  A    Right.

23  Q    Did he play sports in high school?

24  A    No.

25  Q    Kept to himself, or was he a popular young man?

1   A    He was in between.

2   Q    Now, he's been married to Blanca Sandoval for roughly give

3   or take eight years?

4   A    Yes.

5   Q    And they've been together and they have a good marriage?

6   A    Yes.

7   Q    Two children?

8   A    Yes.

9   Q    How old?

10  A    They're five and six.

11  Q    Boy/girl, girl/boy?

12  A    Boy and girl.

13  Q    So you are the aunt?

14  A    Yes.

15  Q    Do you ever take care of the kids?

16  A    Yes, with my mom.

17  Q    Has it ever come to pass that you've gone over to your

18  brother's house, your sister-in-law's house, and you all sat

19  around and had some iced tea or had dinner?

20  A    Yes.  For holidays.

21  Q    How does Oscar to that effect interact with his wife and

22  his children?

23  A    They're loving to each other.

24  Q    Any drama?

25  A    No.

1  Q    Any guns?

2  A    No.

3  Q    Any violence?

4  A    No.

5  Q    Any foul language?

6  A    No.

7  Q    So much these days you hear in the news about family

8  violence.  None of that in this situation?

9  A    No.  He would never do that.

10  Q    So if I were to ask you some legal questions about his

11  physical and mental condition and his family ties, that would

12  all be good?

13  A    Yes.

14  Q    Length of residence?  Your brother's a U.S. citizen?

15  A    Oh, yes.

16  Q    And to your understanding, he has no criminal history?

17  A    He doesn't have a criminal history.

18  Q    Now, I did ask you about his concealed weapons permit.

19  A    Right.

20  Q    And you indicated that you had a little bit of knowledge

21  about that.

22  A    Yes.

23  Q    Did your brother at some point in time, roughly give or

24  take two, two and a half years ago, go and complete a concealed

25  weapons permit course?

1  A    Yes.

2  Q    Do you have a concealed weapons permit?

3  A    No, I don't.

4  Q    And did I show you my concealed weapons permit?

5  A    Yes.

6  Q    And did I tell you that getting a concealed weapons permit

7  means you have to go to the range?

8  A    Uh-huh.

9  Q    Now, you can't say "Uh-huh."

10 A    Yes.

11 Q    Okay.  You shoot a gun.  You've got to hit a target.  Okay.

12 Is that a yes?

13 A    Yes.

14 Q    You have to take a written test?

15 A    Yes.

16 Q    You have to fill out all the applications.

17 A    Yes.

18 Q    Correct?

19 A    Yes.

20 Q    Some people would say that when you do a concealed weapons

21 permit that you're trying to follow the rules.  Would you agree

22 with that sentiment?

23 A    Yes.

24 Q    If I were to use the word "promise" with you, you would

25 know what "promise" means?

1   A    Yes.

2   Q    And you've heard Ms. Walker testify, you've heard your

3   mother testify.  Can you also tell -- promise the judge that if

4   the judge saw fit, whatever the condition may be, that Oscar

5   Gonzalez is not going to give anybody a hard time?

6   A    I promise, and he's not.

7   Q    Specifically, the Government has said in this motion that

8   he's a flight risk.  Would he flee?

9   A    No.

10  Q    Would one of the reasons be that he's not going to flee

11  because of his kids, his family, all these 15 or 16 people that

12  are here?  Would that be a reason he's not going to flee?

13  A    Yes.

14  Q    If the judge were to say, "Okay, Mr. Gonzalez, worst-case

15  situation, you are going out to the Eastern District of

16  Virginia.  Pack your bags, catch a flight, and go out there a

17  week from now," Oscar would do that?

18  A    Yes.

19  Q    In a worst-case situation?

20  A    Yes.  If the judge ordered, yes.

21  Q    And what about safety of the community?  Now, I asked you

22  this in a different fashion before about violent propensities,

23  but does anyone have anyone to fear with Oscar being out on

24  bond?

25  A    No, they don't.

1  Q    Is Mr. Gonzalez, your brother, the type that's going to go

2  out and pick a fight?

3  A    No.  He's very peaceful.

4  Q    Okay.  And certainly, you've just met me.

5  A    Right.

6  Q    Do you think that, with the judge's promise and my ability

7  to talk to Mr. Gonzalez, it will be 180 percent that there's

8  not going to be any type of issues if the judge were to see fit

9  --

10  A    Yes.

11  Q    -- to give a bond?

12  A    Yes.

13  Q    And I explained to you that sometimes the judges in this

14  district and other districts can put big GPS devices on their

15  ankles.  Would Oscar comply with that?

16  A    Yes, he would.

17  Q    Pay whatever the cost is?

18  A    Yes.

19  Q    What if the judge said, "Okay.  You know what?  I don't

20  really have a problem with curfew, but still I want you home at

21  8:00 o'clock."  Would Mr. Gonzalez do that?

22  A    Yes, he would.

23  Q    What if the judge said, "I want you, Oscar, to go report

24  once a week."  Would Mr. Gonzalez do that?

25  A    Yes, he would.

1  Q    And he's not going to bellyache about it or give anybody a

2  hard time?

3  A    No, because he's responsible.

4  Q    And when you say he is responsible, give me an example.

5  A    He's always there for his kids and me and my mom and my

6  dad, so --

7  Q    So if he's the -- is he the type of person, kind of like my

8  sister is, that when she says she'll be there on January the

9  27th at 8:00 o'clock, that my sister shows up on January the

10 30th at 10:00 p.m.?  Oscar's not like that, is he?

11 A    No, he's not.

12 Q    If he says he's going to do something, is he righteous

13 about doing it?

14 A    He will, yes.

15         MR. LECHTENBERGER:  May I have a moment, Your Honor?

16         THE COURT:  Yes.

17    (Pause.)

18 BY MR. LECHTENBERGER:

19 Q    Do you know anything about the 9191 Garland address that

20 they live at, the "they" pronoun being he and his wife?

21 A    Yes, I --

22 Q    Have you been there?

23 A    I've been there several times.

24 Q    A little apartment?

25 A    It's a medium-size apartment.

1   Q   Does your sister-in-law carry or walk around with Gucci

2   bags or with Louis Vuitton shoes?

3   A   No, not that I know of.

4   Q   In any event, do you know anything about an address over on

5   Weather Vane?

6   A   No.

7   Q   Have you ever heard that address before?

8   A   I've never heard of that address before.

9   Q   Do you understand that Mr. Gonzalez, whether he is a

10  trafficker in marijuana, whether he's a trafficker in cocaine,

11  whether he's not a trafficker at all, the allegation right now

12  is very, very important?  Do you understand that?

13  A   Yes.

14  Q   And it carries a very significant penalty.  Do you

15  understand that?

16  A   Yes.

17  Q   Now, I've spoken to you about how serious this offense is,

18  --

19  A   Yes.

20  Q   -- the allegation.

21  A   Yes.

22  Q   Nonetheless, can you tell the judge and promise her that

23  everybody in the community is going to help Oscar if the judge

24  sees fit that we've overcome the presumption and she gives any

25  type of conditions on this planet or a combination of those

1   conditions?   Could that happen?

2   A    Yes.   I promise.

3   Q    Now, sometimes judges even put money bonds.   That is, that

4   you'd have to come up with $10,000 or $15,000.   Could the

5   family also work to get a bond?

6   A    Yes.   We will collect.   We'll try to collect as much as we

7   can.

8   Q    And I told you that I could help you with a bonding company

9   that does federal bonds.   Do you remember talking to me about

10  that briefly?

11  A    Yes.

12  Q    Ms. Gonzalez, I'm going to leave you with this question.

13  How, in your heart of hearts, can you promise the judge that

14  she's not going to have any problems with Oscar Gonzalez?

15  A    I can promise without any hesitation.

16  Q    How?

17  A    Because he's a good person.

18  Q    But you've heard what the agent said.   You've heard how the

19  AUSA has handled this.   Correct?

20  A    Right.

21  Q    It doesn't --

22  A    I don't --

23  Q    It doesn't look good.

24  A    In my heart of hearts, he's a good person.

25  Q    Fair enough.

1          MR. LECHTENBERGER:  I'll pass the witness, Judge.

2          THE COURT:  Okay.

3                         CROSS-EXAMINATION

4   BY MR. CALVERT:

5   Q   Ms. Gonzalez, very briefly, would your brother ever

6   associate with convicted felons?

7   A   No.

8   Q   In your mind, he would never do that, correct?

9   A   I would think not.

10  Q   All right.  And you've heard testimony here today that he

11  was recorded, recorded multiple times, discussing the

12  distribution of either cocaine, marijuana, whatever drug you

13  want to call it, but definitely drugs, with a not only

14  convicted drug dealer -- excuse me, convicted felon, but also

15  admitted drug dealer.  You heard that today, correct?

16  A   Yes.

17  Q   If that's true, would that shock you?

18  A   It would shock me, but --

19  Q   And I understand.  I have a sister and a brother as well.

20  Let me just cut to the chase.  Is it fair to say, no matter

21  what I say to you or ask you, your opinion is going to stay the

22  same, that your brother is a good person?

23  A   Yes.

24  Q   All right.  And would your brother ever distribute any type

25  of drug -- marijuana, cocaine, any type of drug?

1  A    Not that I know of.

2  Q    Would he ever possess multiple assault weapons?

3  A    He, like they mentioned before, he does collect guns.  And

4  I --

5  Q    And what does he collect those for?

6  A    Just a collection.

7  Q    All right.  And along with that are 100-round drums so that

8  you could shoot 100 shots at a time.  Does he collect those as

9  well?

10  A    If it's on the exhibit, then yes.

11  Q    Why would he need that?

12  A    For a collection.

13  Q    And what are you going to do with a collection like that?

14  A    Why do people collect?

15  Q    Well, I assume if you collect cars you're going to take

16  those cars out and use them.

17  A    No.

18  Q    Correct?

19  A    No.

20  Q    You're not?  You're just going to sit them in your garage

21  and do nothing with them?

22  A    Jay Leno does it.

23  Q    All right.  If -- let's combine everything together, then.

24  If your brother is discussing distributing drugs with

25  individuals, and he's possessing assault weapons, and he's

1  possessing 100-round drums, even if all that were true, and

2  he's been linked to a stash house where scientific evidence

3  exists showing that methamphetamine and cocaine was present,

4  kilo wrappers, no matter what evidence is presented to you, you

5  will never believe that your brother is a drug dealer.  Fair to

6  say?

7  A    Yes.

8  Q    Thank you, ma'am.

9           MR. CALVERT:  Pass the witness.

10          MR. LECHTENBERGER:  Nothing, Your Honor.

11          THE WITNESS:  May I be --

12          THE COURT:  Oh, I do have a few questions.

13          THE WITNESS:  Yes.

14          THE COURT:  It's weird here in federal court.  We get

15  to do that if we want to.

16                    EXAMINATION BY THE COURT

17          THE COURT:  You mentioned that you were familiar with

18  your brother's apartment?

19          THE WITNESS:  Yes.

20          THE COURT:  Who lives at his apartment?

21          THE WITNESS:  His two kids, his wife, and him.

22          THE COURT:  And there has been mention of an Escalade.

23  Is that your brother's car?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  Do you know what year it is?

1          THE WITNESS:  I don't have any idea.

2          THE COURT:  Do you know if his wife drives a different

3 car, or --

4          THE WITNESS:  My brother sells and collects cars, or

5 and gets them from auction, so she drives numerous cars.

6          THE COURT:  So, does he possess a lot of cars?

7          THE WITNESS:  Yes, because of the auction and people

8 who sell it to him.

9          THE COURT:  How many cars would you say that he has?

10          THE WITNESS:  I know he has maybe three or four.

11          THE COURT:  Okay.

12          THE WITNESS:  He sold the car that I have to me, so

13 that's how I know.

14          THE COURT:  What kind of cars does he have?

15          THE WITNESS:  He has a little Toyota.  They had a

16 Lexus, a little SUV.  And I think they sold that one.  And the

17 mention of the Cadillac.

18          THE COURT:  Is the tire business your father's

19 business?

20          THE WITNESS:  It's both of theirs.

21          THE COURT:  They own the --

22          THE WITNESS:  Yes.

23          THE COURT:  -- tire business together?

24          THE WITNESS:  Uh-huh.

25          THE COURT:  And do you know, what job does your

1  brother have at the tire business?

2          THE WITNESS:  It's basically he runs it, with -- along

3  with his wife's dad.  Her -- yeah, his wife's dad.

4          THE COURT:  So it's not your dad; it's his wife's dad

5  he works in the --

6          THE WITNESS:  Well, he works there.

7          THE COURT:  -- business with?

8          THE WITNESS:  They're all -- they all work together.

9          THE COURT:  Your dad, your husband's wife's dad, --

10          THE WITNESS:  Yes.

11          THE COURT:  -- and your -- I mean, your brother's

12  wife's dad?

13          THE WITNESS:  Yes.

14          THE COURT:  And your brother?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.  Do you know, other than the tire

17  shop and selling the cars, anything else that your brother does

18  for a living?

19          THE WITNESS:  No.

20          THE COURT:  Does his wife work?

21          THE WITNESS:  She does hair.

22          THE COURT:  She's like a hair stylist, --

23          THE WITNESS:  Yeah.  She works --

24          THE COURT:  -- a hairdresser?

25          THE WITNESS:  Yes.

 1              THE COURT:  Okay.  That's all the questions I had.

 2    Does either side have questions based on what I've asked?

 3              MR. CALVERT:  Nothing from the Government, Your Honor.

 4              THE COURT:  Mr. --

 5              MR. LECHTENBERGER:  Thirty seconds, Your Honor?

 6              THE COURT:  Of course.

 7         (Pause.)

 8              MR. LECHTENBERGER:  Thank you, Your Honor.  Nothing

 9    further.

10         (The witness steps down.)

11              MR. LECHTENBERGER:  We'll rest, Your Honor.

12              MR. CALVERT:  We rest and close, Your Honor.

13              THE COURT:  Okay.

14              MR. LECHTENBERGER:  Judge, I'll close with the *caveat*

15    of what I said initially by falling on the sword and telling my

16    client when I found out --

17              THE COURT:  Well, do you want to argue first?  You

18    can.

19              MR. LECHTENBERGER:  Well, Judge, I'm sensitive to the

20    Court, you've always been square with me in the past.  I just

21    --

22              THE COURT:  Oh, okay.

23              MR. LECHTENBERGER:  -- don't want you to deny my -- or

24    say that I haven't overcome the burden because my client

25    followed and heeded my instructions on the Pretrial Services

1    report.  So --

2            THE COURT:  Well, first of all, let me say that I'm

3    not holding someone's exercising the right not to talk to

4    Pretrial against them.  The only reason I would be concerned is

5    that there isn't the information that is verified.  I will say

6    to you that it's been my experience in these last 19 months

7    that the way Pretrial would verify that information is to talk

8    to some of the same witnesses who have testified about it.  And

9    so I would just assume that that information is true.

10           So, but it's your -- whatever you decide that you want to

11   do.  I know that they would verify that information by asking

12   those questions of the same -- some of the same witnesses,

13   either Mr. Gonzalez's wife, mother, sister.  And so I have no

14   reason not to believe that at least the personal information

15   that would be contained in the Pretrial Services report that's

16   come out here is not what they would have verified.

17           MR. LECHTENBERGER:  And that's why I mentioned to you,

18   Your Honor, that it was my fault initially but that I would tie

19   everything in and run it with the other questions to try to,

20   for the sake of brevity, make this a little quicker, more

21   expeditious for the Court.  So, with what you've said, Your

22   Honor, I will stand down.  I would like to briefly argue.

23           THE COURT:  Okay.

24           MR. LECHTENBERGER:  Again, if that's what you would

25   like.

1          THE COURT:  I can give you that opportunity, as well

2   as Mr. Calvert, but I'll let him go first.

3          MR. CALVERT:  Your Honor, as the Court is aware, this

4   is a presumption case.  I would just point out that this is not

5   some case where a young 23-year-old individual with no criminal

6   history gets picked up on the side of the road on some

7   interdiction stop with a small quantity of cocaine and we're

8   here arguing about whether or not he should be detained or not

9   detained.  When you look at the totality of the facts of this

10  case, Mr. Gonzalez is a major cocaine distributor.  In context

11  of the indictment in the Eastern District of Virginia, you've

12  got eight individuals indicted.  It is the Government's

13  position and law enforcement's position that Mr. Gonzalez is

14  the source of supply, cocaine source of supply, for all of

15  those individuals.

16      According to Mr. Morgan, who again I would challenge anyone

17  to find in any way any information that Mr. Morgan provided to

18  law enforcement that turned out to be inconsistent, and it's

19  his position for the past two years that Mr. Gonzalez has

20  provided him a minimum of 150 kilograms of cocaine.  That's

21  over 300 pounds of cocaine.  Now, we can parse everything and

22  have an explanation for everything that's come out in this

23  hearing.  When law enforcement finds multiple firearms,

24  multiple assault weapons, drums that have 100-shot magazines

25  that attach to assault weapons, we can explain that away if we

1  want to and say, oh, well, he's a gun collector.  We can find

2  an individual with multiple vehicles, who admittedly by his

3  mother's testimony works at a tire shop that is doing poorly,

4  and say, well, he collects cars and he sells them to other

5  people.  And we can say, well, he also has been linked to a

6  stash house where an ion scan indicates the presence of

7  cocaine, methamphetamine, as well as wrappers consistent with

8  kilo wrappings, and we can say, well, but I could pull out a

9  dollar bill out of my wallet and there might be traces of

10 cocaine on that as well.  And we can search the residence he

11 was located in and find not one or two cell phones but nine

12 cell phones, and we can say, well, you know, people go through

13 cell phones.  That's a common practice.  That doesn't mean he's

14 a bad guy or a criminal.

15     And of course you can do all that if you don't apply any

16 reason or common sense to that argument.  The fact of the

17 matter is that, combining all of those things together, it is

18 clear that Mr. Gonzalez is a substantial cocaine trafficker.

19     And you'll note, Your Honor, I intentionally left out the

20 fact, in putting those facts before the Court, the fact that he

21 is recorded multiple times talking to an admitted cocaine

22 distributor about providing him with 20 kilos of cocaine.

23     And I bring all that to the attention of the Court, Your

24 Honor, because -- and God bless the witnesses that came up and

25 testified for him, but no matter what anybody said, they were

1  going to have the opinion that he's a good guy, a churchgoing

2  guy, he's never going to break the law.  He's a drug dealer.

3  Well, a lot of times, and it's been proven time and time again,

4  people don't know all there is to know about the individuals

5  that they're close to.

6      And I bring all this to the Court's attention, Your Honor,

7  because one of the factors the Court is to consider is the

8  weight of the evidence.  The weight of the evidence is

9  overwhelming in this case that this defendant is a cocaine

10 trafficker.

11     Now, we can stand up and argue before the Court, well, Your

12 Honor, yes, he distributes drugs, but it's marijuana.  And if

13 that's the argument that the defense wants to make up in

14 Virginia, so be it.  But as far as where we are here, it is

15 clear before the Court that Mr. Gonzalez is a major

16 distributor.  He is the top -- on the top of the food chain as

17 far as this conspiracy is concerned in the Eastern District of

18 Texas [sic].  He possessed assault weapons.  He has no real

19 legitimate form of employment other than his drug-dealing

20 activities, other than, I guess, working at a tire shop or

21 collecting guns or collecting cars and selling cars.  And it

22 appears that he has all the trappings of a drug dealer, that

23 being assault weapons, firearms, stash house, multiple cell

24 phones.

25     And Your Honor, I would just urge the Court to consider all

1    of these factors in view of a reason and common sense when

2    making a determination whether or not he is a threat to the

3    community.

4        Now, whether or not he's a flight risk, certainly, that's

5    up to the Court to decide.  I would submit to the Court that

6    based on the level that he will certainly be at if convicted,

7    that being over or at 150 kilograms, he is looking at a

8    substantial, substantial amount of time in the penitentiary,

9    certainly as much as he's been alive to this date, if he's

10   convicted.  And Your Honor, that is certainly an incentive to

11   flee.

12       But aside from that, there is a presumption that he is a

13   danger to the community, and all of the evidence that's been

14   presented to this Court is consistent with that.

15       And with that, we would urge the Court to detain him, order

16   that he be sent back to the Eastern District of Virginia to

17   answer these charges, and certainly determine that through the

18   course of these proceedings that probable cause has been met.

19           THE COURT:  Thank you.

20           MR. LECHTENBERGER:  I'll begin my approach to the

21   Court by just asking for us, in a clear and level-headed and I

22   guess soft approach, to look at the motion for detention.  The

23   Government has x'd off four reasons here why the Court should

24   detain my client.  Certainly, I have advised him and talked to

25   him about what the presumption means.  There is no doubt -- and

1   I think the Government will even concede this, if pressed --

2   that my client would appear.  If Agent Hale, who's an

3   experienced agent, and Mr. Calvert, who's a very experienced

4   AUSA who's in a supervisory position here, had any evidence

5   that he was going to go to Mexico or that he had traveled to

6   Mexico or had a fake passport, you would have heard that.

7   Thus, the absence of that evidence helps me.  So we can get rid

8   of that, because he will appear.

9        Next, the Government talks about how he's some type of

10  danger or threat to the community, and just belabors and

11  belabors this gun.  And certainly I've been doing this for a

12  while.  The AUSA has.  But at some point in time, just talking

13  about it doesn't mean it's necessarily so.  In fact, Ms.

14  Gonzalez had a fairly good remark about Jay Leno collecting

15  cars.  Do I approve of it?  No.  Is it something I would do?

16  No.  I'm not trying to be clever or cute, but we're not parsing

17  out.  All we're doing is pointing out that none of these

18  weapons under 18 U.S.C. 924 are illegal.  I could go down to my

19  buddy's store on Sylvan at Ray's Gun Store and purchase

20  anything I want that's out of Government's Exhibit 1 through 8.

21  And at the end of the day, I think that's important for the

22  Court to understand.

23       Do I wish I could go back in time and say, what are you

24  doing with those guns?  Sure.  They look bad.  I'll admit it.

25  It's the wart on my forehead.  I'm going to expose it.  I'm not

1    going to hide it from you, Judge.  Which is, one more time, why

2    I had all these folks down here.  I had three witnesses -- they

3    were honest, truthful and credible -- that came up, hit the

4    witness stand, as uncomfortable as it would be, and be cross-

5    examined by a good AUSA like Mr. Calvert.

6        The assault rifles are something for the Court to consider.

7    We've rebutted that.  So, if I've handled the serious flight

8    risk, the appearance, that he would comply with any condition

9    -- and I mean any.  Put every one of them you want on him,

10   Judge, if that makes you feel better.  But I think, with

11   electronic monitoring, with curfew, with GPS, make him check in

12   with the Marshals whenever you want and Pretrial Services.

13   Verification.  Show you bank accounts.  We'll do everything.

14   Give up your Fourth Amendment rights if they want to do a home

15   study, a home search.  Fine.

16       That leaves us with the main one that Mr. Calvert was so

17   stressing with the Court, which would be the 10-plus drug

18   offense.  I would take exception and disagree with being

19   characterized -- that is, Mr. Gonzalez being characterized as

20   the head of this drug organization.

21       Now, far be it from me to come in here to court and say

22   that he's just a Pollyanna or that he's innocent or he's white

23   as the driven snow.  I'm not saying that.  In fact, my whole

24   argument today was a little bit unorthodox.  It's something

25   that is unconventional.  I suspect that Agent Hale caught him

1   with something.  I don't know yet.  I haven't seen any

2   discovery.  But just based on my dealings professionally with

3   Agent Hale, I know he's a good agent.  And if he says up on the

4   witness stand that my guy said 20 or 21, it's probably true.

5   No reason to doubt what he said.

6       What my contention is is how do we know it's cocaine?

7   What, because some guy, Mr. X, out of Virginia says that he has

8   gold rims on his teeth?  Really?  So, beyond a doubt, beyond a

9   reasonable doubt in trial or at this presumption hearing, that

10  somehow because somebody, Mr. X, whose proper noun name we

11  don't know, says he has gold on his teeth, that somehow means

12  he's the head poobah, that he's the head guy?

13      But they want to then I guess dovetail into saying that,

14  somehow or another, okay, well, we have that, and then we have

15  Mr. Morgan, a/k/a Silverback, who we know through my cross-

16  examination has a moral turpitude offense, fraud or theft or

17  stealing or something, which means that that impinges your

18  character.  That means that person is given less weight.

19      So if you boil everything down, what the Government has is

20  some type of 21 or 20 deal.  Okay.  Could it be kilos, could it

21  be pounds, could it be meth?  I guess.  I guess, in the world

22  of the Government, it could be heroin even.  An ion scanner.

23  Really?  I mean, an ion scanner.  Judge, you've had experience

24  with those.  Those are microscopic things.  I mean, they're

25  atoms, however you want to characterize it.  I mean, if they

1    had any type of proof, don't you know we would have seen a

2    picture of that?  Instead, they want to beat me over the head

3    and belabor this point about the guns.

4        So, at the end of the day and at the end of my argument,

5    what I'm going to point out, under 18 U.S.C. 3142, Subsection

6    (g)(2), I have rebutted it.  It was hard as heck to get all

7    these folks down here.  And I say that just because you know

8    it's true.  Getting folks down here, within a 48-hour period of

9    when I get hired, to get them down here out of their busy

10   schedule, to come down and show that in their heart of hearts

11   that they care about this man and they'll vouch for him,

12   they'll promise for him, it's tough to do.

13       Judge, I've rebutted it.  I would ask you for a bond.

14   Thank you.

15           THE COURT:  Mr. Gonzalez, I find that there is

16   probable cause to believe that you committed the offense

17   alleged in the criminal complaint -- that is, conspiracy to

18   possess with the intent to distribute more than five kilograms

19   of cocaine.  That offense gives rise to a rebuttable

20   presumption under the statute that there is no condition or

21   combination of conditions I could impose which would reasonably

22   assure the safety of the community and your appearance as

23   required.

24       At this point, based on the evidence that I have heard --

25   and I do think that there is strong evidence that you in fact

1   are a larger-scale dealer, not the largest I've ever heard of

2   but a large-scale dealer of cocaine -- I don't find that you

3   have rebutted the presumption or that the presumption that you

4   would be a danger to society has been rebutted.

5        Both Congress and the Courts have made a point of finding,

6   concluding, that drug offenses, drug trafficking offenses, are

7   inherently, inherently violent.  The fact that guns were also

8   involved, meaning that you possess guns, and I do find that you

9   actually traffic in cocaine, makes me believe that that's the

10  circumstance that probably exists in this case, that there is

11  that danger to the community.

12       For that reason, I am going to order you detained.  I am

13  going to order you transferred to the Eastern District of

14  Virginia to answer the charges in the criminal complaint.

15       Mr. Lechtenberger did an excellent job for you, and my

16  standard here is not the same standard as what a jury would

17  have to consider to determine ultimately whether or not you are

18  guilty under the law for that.  But for the purposes that we

19  are here, where my standard is not as high as that, I do make

20  the findings that I have announced here.

21       So you are remanded to the custody of the U.S. Marshal for

22  transfer to the Eastern District of Virginia.

23       Is there anything else we need to take up at this time?

24            MR. CALVERT:  Nothing from the Government, Your Honor.

25            MR. LECHTENBERGER:  Nothing from the Defense, Judge.

1              THE COURT:  Then that concludes your hearing, Mr.

2    Gonzalez, and you're remanded to custody at this time.

3              MR. LECHTENBERGER:  May I be excused, Your Honor?

4              THE COURT:  Yes, sir.

5         (Proceedings concluded at 3:55 p.m.)

6                            --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20      I certify that the foregoing is a correct transcript from

21   the digital sound recording of the proceedings in the above-

22   entitled matter.

23

24   _____       _____
     Kathy Rehling                             Date
     Certified Electronic Court Transcriber
25   CET**D-444

```
 1                              INDEX

 2    PROCEEDINGS                                                  2

 3    WITNESSES

 4    Government's Witnesses      Direct Cross Redirect Recross Court

 5    Tommy Hale                     4    24    34      39

 6    Defendant's Witnesses       Direct Cross Redirect Recross Court

 7    Whitney Walker                 42    50
      Parsabana Angelica Gonzalez    57
 8    Vanessa Gonzalez               63    74                      76

 9    EXHIBITS

10    Government's Exhibits                       Identified Received

11    1-8   Photographs                               17        18

12    Defendant's Exhibits                        Identified Received

13    1   Photograph                                  45        46
14    2   Letter of Reference                         45        46

15

16    RULINGS                                                     88

17    END OF PROCEEDINGS                                          90

18    INDEX                                                       91

19

20

21

22

23

24

25
```